ACCEPTED
04-15-00029-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
4/8/2015 11:57:28 PM
KEITH HOTTLE
CLERK

## NO. 04-15-00029-CV

IN THE FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
04/8/2015 11:57:28 PM
KEITH E. HOTTLE
Clerk

DIAGNOSTICS RESEARCH GROUP, L.L.C. AND
JOHN R. HOLCOMB, M.D., APPELLANTS

V.

SUSHMA VORA, APPELLEE

## BRIEF OF APPELLEE
## SUSHMA VORA

`

**CHRISTOPHER J. DEEVES**
State Bar No. 00790575

**THE LAW OFFICE OF
CHRISTOPHER DEEVES, P.C.**
1370 Pantheon Way, Suite 110
San Antonio, Texas 78232
(210) 445-8807
(210) 501-0915 (telecopier)
chrisdeeves@att.net (e-mail)

**ATTORNEY FOR APPELLEE
SUSHMA VORA**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iv

ISSUES PRESENTED....................................................................................vi

STATEMENT REGARDING ORAL ARGUMENT ...............................................vi

STATEMENT OF FACTS ...............................................................................1

    A.    BACKGROUND FACTS ...................................................................1

    B.    PROCEDURAL HISTORY ................................................................1

SUMMARY OF THE ARGUMENT ...................................................................8

ARGUMENT AND AUTHORITIES...................................................................8

I.     EXPERT REPORT REQUIREMENTS .......................................................11

II.    STANDARDS OF REVIEW .....................................................................11

III.   THE CLAIMS AGAINST DIAGNOSTICS RESEARCH GROUP
      ARE NOT HEALTH CARE LIABILITY CLAIMS ...................................14

IV.   DR. MULROY WAS QUALIFIED TO OPINE IN THIS MATTER ..........15

V.    DR. MULROY PROPERLY EXPLAINED THE CAUSAL
      RELATIONSHIP BETWEEN THE CONDUCT AT ISSUE
      AND MS. VORA'S INJURIES....................................................................16

VI.   DR. MULROY'S REPORT WAS A GOOD FAITH EFFORT
      TO COMPLY WITH THE STATUTE AND THUS MS. VORA
      HAS THE OPPORTUNITY TO CURE ANY DEFECTS
      FOUND BY THIS COURT UPON REMAND ...........................................19

CONCLUSION AND PRAYER .......................................................................20

CERTIFICATE OF COMPLIANCE.................................................................20

CERTIFICATE OF SERVICE .................................................................................22

APPENDIX .............................................................................................................23

    ORDER AT ISSUE

    DR. MULROY'S REPORT

    DR. MULROY'S CV

    SALVATO v. ANGELO

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873 (Tex.2001)....

*Birdwell v. Texarkana Memorial Hospital*, 122 S.W.3d 473
 (Tex.App.—Texarkana 2003, pet. den.)...........................................................

*Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48 (Tex. 2002).........................................

*Chandler v. Singh*, 129 S.W.3d 184 (Tex.App.—Texarkana 2004, no pet.)...............

*Longino v. Crosswhite*, 183 S. W.3d 913 (Tex.App.—Texarkana 2006, no pet.) ......

*Murphy v. Russell*, 167 S.W.3d 835 (Tex. 2005) .......................................................

*Philipp v. McCreedy*, 298 S.W.3d 682 (Tex.App.—San Antonio 2009, no pet.)

*Poindexter v. Bonsukan*, 145 F.Supp.2d 800, 811 (E.D.Tex—Lufkin Div., 2001)

*Salvato v. Angelo*, No. 14-07-0748-CV, Tex.App.—Houston [14th Dist.]
April 8, 2008, no pet.) .................................................................................

*Schmidt v. Dubose*, 259 S.W.3d 213 (Tex.App.—Beaumont 2008, no pet.).............

*VHS San Antonio Partners v. Garcia*, 2009 WL 3223178 (Tex.App.—San
Antonio, Oct. 7, 2009, pet. den.)(mem.op.).................................................................

## STATUTES

TEX. CIV. PRAC. & COMM. CODE § 74.351.........................................................*passim*

## RULES

TEX.R.APP.P. 39........................................................................................v

## ISSUES PRESENTED

Did the trial court properly hold that the claim against DRG was not a healthcare liability claim because (1) DRG was not a healthcare provider or physician and (2) DRG did not treat Ms. Vora but only studied a pre-market medication on her?

Did the trial court properly hold that Dr. Mulroy was qualified to opine about the standard of care, breach thereof and causation because she had conducted numerous similar studies of pre-market medications and was familiar with when patients should be removed from such studies following severe adverse events?

Did the trial court properly hold that Dr. Mulroy's expert report adequately addressed the element of causation?

## STATEMENT REGARDING ORAL ARGUMENT

Appellee believes oral argument will benefit the Court in this matter. While the applicable law in this area is clear, the application of the law to the facts of this case presents matters for which oral argument will benefit the court. TEX.R.APP.P. 39.

TO THE HONORABLE COURT OF APPEALS:

Appellee/Plaintiff, Sushma Vora ("Vora"), respectfully presents her response brief. For the sake of clarity, Appellant John R. Holcomb, M.D. will be referred to as "Dr. Holcomb." Appellant Diagnostics Research Group, L.L.C. will be referred to as "DRG." Appellee Sushma Vora will be referred to as "Ms. Vora."

## STATEMENT OF FACTS

### I. BACKGROUND FACTS

Ms. Vora participated in a pre-market study of linaclotide conducted by DRG, the studying facility, with Dr. Hoclomb serving as the principal investigator. During the study, Ms. Vora suffered a series of severe adverse events. On or about January 11, 2011, Ms. Vora suffered her first severe adverse event--ileus (a bowel condition related to the side effects of linaclotide) and was hospitalized. CR 30. In March 2011, Ms. Vora had second severe adverse event---another hospitalization from a bowel ailment. CR 30. In May 2011, Ms. Vora was hospitalized for a third time as a result of vomiting and distended abdomen, another severe adverse event. CR 31. Thereafter, Ms. Vora was removed from the study after the third hospitalization—her third severe adverse event.

### II. PROCEDURAL HISTORY

Ms. Vora filed suit against Dr. Holcomb and DRG amongst others on January 8, 2013. CR 1-6 . She then served the statutorily required expert report on

May 8, 2013. TEX. CIV. PRAC. & REM. CODE § 74.351. On May 30, 2013, Dr. Holcomb and DRG filed objections to the expert report. CR 7-37. Those objections were then considered by the Honorable Larry Noll who found (1) the claims against DRG were not health care liability claims and (2) that Dr. Mulroy's expert report adequately notified Dr. Holcomb regarding the health care liability claims against him. CR 50-51.

## SUMMARY OF THE ARGUMENT

The parties do not dispute the legal standards in this area which are well established. The issues before this Court are whether the trial court properly applied them to the facts of this case, which he did.

First, DRG does not qualify a "physician" or "healthcare provider." While DRG cleverly presents this Court with new evidence never before the trial court to attempt to show that DRG so qualifies. This Court, however, may not consider this evidence because it is outside the four corners of the expert report and, most importantly, was never before the trial court.

Next, the claim against DRG is not a "health care liability claim." There was no care being provided to Ms. Vora as part of an experimental study conduct by DRG—which is a study facility.

However, even if the causes of action against DRG were "health care liability claims," the report as to DRG was sufficient just as it was to Dr. Holcomb.

8

Dr. Mulroy was qualified to opine her because she conducts studies and looks for severe adverse events—such as hospitalizations related to side effects of the medication and then evaluates whether to continue the person in the study. Dr. Mulroy has conducted numerous such studies and was conducting such studies at the time of the event at issue. CR 24-32.

Appellants' argument that a person asserting a "health care liability claim" involving a side effect of a pre-market medication needs to provide an expert specifically trained in such side effects defies logic. A psychiatric medication could have side effects such as diarrhea, skin rash and heart murmur. Would Dr. Mulroy need to enlist a gastroenterologist, dermatologist and cardiologist to conduct a study of such a medication? Would Dr. Mulroy need to enlist the aid of such a lengthy crew of doctors in prescribing such a medication? Of course, not. If the patient appeared with a skin rash after being prescribed the medication then Dr. Mulroy, even though she is a psychiatrist, could determine the need to take the patient off the medication. She would not need to refer the patient to a dermatologist. However, Appellants want to avoid the real world and claim that only a doctor specifically familiar with linaclotide could serve as an expert. One must ask where would such a doctor be found given Ms. Vora was involved with a pre-market study of the drug? Indeed, on page 23 of their brief, Appellants, in essence, contend that Dr. Mulroy cannot testify because studies of the prolonged

9

use of linaclotide is not a matter developed in various fields. Of course, it isn't—it's a pre-market drug. The bar cannot be set so high for a claimant that she cannot overcome it. Dr. Mulroy is fully qualified to testify that when a study participant suffers severe adverse events (in this case, a hospitalizations) for a known side effect of the drug, that the participant should not continue in the study. The trial court did not abuse its discretion in finding Dr. Mulroy qualified.

Finally, Appellants contend that Dr. Mulroy's opinion on causation is conclusory. Rather, Dr. Mulroy's opinion in this regard is simply short and direct. If you remove a study participant from the study after severe adverse event(s) related to the study medication then the patient will not suffer another one. Indeed, Ms. Vora was pulled from the study after the third severe adverse event by Appellants for this very reason.

In sum, Appellants want to make this case more complicated than it is. Dr. Mulroy conducts research studies, monitors participants for severe adverse events and then removes patients who incur them so that the severe adverse events do not continue. Dr. Mulroy, in her detailed report, then explained how Dr. Holcomb and DRG did not do that and how an unnecessary severe adverse event occurred. The trial court did not abuse its discretion in denying the motions to dismiss.

## ARGUMENT AND AUTHORITIES

### I.   EXPERT REPORT REQUIREMENTS

Pursuant to § 74.351(a), a plaintiff asserting a health care liability claim is required to serve one or more expert reports and a curriculum vitae for each health care provider or physician against whom a liability claim is asserted. The expert report is to include: (1) a fair summary of the expert's opinions about the standard of care; (2) the manner in which the care failed to meet the standard; and (3) the causal relationship between the failure and the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); A*m. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex.2001). The report must fulfill the dual purpose of notifying each defendant of the specific conduct called into question and providing support for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). The report should "represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM. CODE § 74-351(*l*). The court looks only to the report in conducting a good faith inquiry. *Palacios*, 46 S.W.3d at 878.

As is clear from the statute, § 74.351 merely "establishes a threshold over which a claimant must proceed to continue a lawsuit." *Murphy v. Russell*, 167

11

S.W.3d 835, 838 (Tex. 2005); *see also Schmidt v. Dubose*, 259 S.W.3d 213, 217 (Tex.App.—Beaumont 2008, no pet.). These statutory provisions are virtually identical to the provisions of TEX. REV. CIV. STAT. ART. 4590i interpreted in *American Transitional Care Centers of Texas v. Palacios*, 46 S.W.3d 873 (Tex. 2001). To constitute a good faith effort, the report must inform the defendant of the conduct the plaintiff has called into question as well as provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879. According to *Palacios*, the trial court should look no further than the four corners of the report itself to determine its adequacy. *Id.* at 878. While the report must address the statutory elements set forth in Art. 4590i Sec. 13.01(r)(6) (now TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6)), the Court held that the report need not marshal all the plaintiff's proof, nor is a plaintiff required to present evidence in the report as if it were actually litigating the merits. *Id.* at 879. Stated another way, the expert report need not prove liability, but need only provide notice of what conduct provides the bases of the plaintiff's complaints. *Chandler v. Singh*, 129 S.W.3d 184, 188 (Tex.App.—Texarkana 2004, no pet.); *Longino v. Crosswhite*, 183 S. W.3d 913, 916 (Tex.App.—Texarkana 2006, no pet.). No magic words are necessary, and the report need only be a summary of the expert's opinions. *See Birdwell v. Texarkana Memorial Hospital*, 122 S.W.3d 473 (Tex.App.—Texarkana 2003, pet. den.). Finally, in determining whether an expert

12

report adequately sets forth any particular element, the court is not limited to any given sentence in isolation, but, rather, the report should be read in its entirety. *See Poindexter v. Bonsukan*, 145 F.Supp.2d 800, 811 (E.D.Tex—Lufkin Div., 2001)(arising out of TMLIIA); *see also VHS an Antonio Partners v. Garcia*, 2009 WL 3223178 at *3 (Tex.App.—San Antonio, Oct. 7, 2009, pet. den.)(mem.op.); *Philipp v. McCreedy*, 298 S.W.3d 682, 690 (Tex.App.—San Antonio 2009, no pet.).

An expert report in a health care liability claim is not required to be an all-encompassing text that addresses every factual aspect of the claim. Instead, the report need only provide a "fair summary of the expert's opinions." The system of challenging an expert report is not intended to be a forum to debate the facts of the case or of an attorney's opinions of the case. *See Palacios*, 46 S.W.3d at 878 (trial court should look no further than the four corners of the report). The fact that the defendant may disagree with the expert's opinions, while perhaps proper for a motion for summary judgment, is not an appropriate basis for challenging the experts Chapter 74 report. *The Methodist Hospital v. Shepherd-Sherman*, 296 S.W.3d 193, 199 n. 2 (Tex.App.—Houston [14th Dist.] 2009, no pet.)(whether an expert's opinions are correct is an issue for summary judgment, not a motion to dismiss under Chapter 74); *see, e.g., Sanjay v. Turner*, 252 S.W.3d 460, 467 n. 6 (Tex.App.—Houston [14th Dist.] 2008, no pet.)(concluding that doctor's

13

arguments that he did not owe duty to patient as described in expert report was an issue for summary judgment rather than a motion to dismiss); *Wissa v. Voosen*, 243 S.W.3d 165, 169-170 (Tex.App.—San Antonio 2007, pet. den.)(same).  Instead, the plaintiff's burden is much lower at this stage of the litigation.

## II.  <u>STANDARDS OF REVIEW</u>

This Court reviews whether a claim is a "health  care liability claim" *de novo* as it is a question of law.  *Bioderm Skin Care, LLC v. Sok,* 426 S.W.3d 753 (Tex. 2014).  Thereafter, the court applies an abuse of discretion standard.

The standard of review on an appeal of an order either granting or denying a motion to dismiss on the grounds of an insufficient expert report is abuse of discretion.  *Hillcrest Baptist Med. Ctr. v. Wade*, 172 S.W.3d 55, 60 (Tex.App.—Waco 2005, pet. dism'd by agr.).  Likewise, abuse of discretion is the standard by which a trial court's determination of whether an expert is qualified to give an opinion in a health care liability claim is reviewed.  *Larson v. Downing*, 197 S.W.3d 303, 304-305 (Tex. 2006)(per curiam); *Baylor Coll. of Med. v. Pokluda*, 283 S.W.3d 110, 116-117 (Tex.App.—Houston [14th Dist.] 2009, no pet.).  An abuse of discretion occurs when a trial court acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles.  *Bowie Mem'l Hosp. v. Wright*, 79 S .W.3d 48, 52 (Tex.2002).  Only clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion.

*Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

## III.   <u>THE CLAIMS AGAINST DIAGNOSTICS RESEARCH GROUP ARE NOT HEALTH CARE LIABILITY CLAIMS</u>

The trial court correctly found that the statutory expert report requirement did not apply to DRG because Ms. Vora did not assert a "health care liability claim." A "health care liability claim" means a cause of action against a ***health care provider or physician*** for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract. TEX. CIV. PRAC. & REM. CODE 74.001(13) (emphasis added). Thus, to be a healthcare liability claim, it must be shown that (1) the defendant is a health care provider or physician; (2) the claim at issue concerns treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or healthcare, or safety or professional or administrative services directly related to health care; and (3) the defendant's alleged act or omission proximately caused the injury. *Loaisiga v. Cerda*, 379 S.W.3d 248, 255 (Tex. 2012).

First, DRG is not a physician or healthcare provider. "Health care" is "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the

15

patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(10). DRG does not provide health care but conducts analysis of pre-market medications on participants—not patients. It is a study facility.

Presenting new evidence on appeal, DRG now tries to argue that it is a physician or physician affiliate. This evidence, not before the trial court, cannot be considered. DRG also makes the argument that because DRG and Dr. Holcomb are subject to the same standards that they are somehow one and the same and thus DRG is then somehow an entity subject to the statute. However, the mere use of the word "and" between discussing two entities does not join them. If Dr. Mulroy referenced the other unrelated study sponsor, Forest Research Institute, in one of these sentences, it is doubtful that the logic that everyone is one and the same would be so willingly applied by DRG. Furthermore, Dr. Mulroy did not clump these entities together when stating her conclusions. CR 31. In her report Dr. Mulroy outlines each parties role (principal investigator, studying facility and study sponsor). While the duties and standards may be similar, the entities do not become joined as a result thereof.

Based upon the evidentiary record developed in the trial court, DRG is not an entity subject to the statutory expert requirements and thus Ms. Vora did not have to produce a report as to it. However, even if such a report was required, the report at issue was more than sufficient as to DRG.

16

## IV.  DR. MULROY WAS QUALIFIED TO OPINE IN THIS MATTER

To be able to provide a report under Section 74.351, an expert must have "knowledge, skill, experience, training, or education" regarding the specific issue before the court which would qualify the expert to opine. *Broders v. Heise*, 924 S.W.2d 148,153 (Tex. 1996).  The issue before the Court is the duties owed to a participant in a study of a pre-market medication.

As Dr. Mulroy states in her report that standard is the same whether the medication is an anti-depressant or a gastroenterological drug.  CR 29.  From her CV and report, it is abundantly clear that Dr. Mulroy has the qualifications to opine about how to conduct a study of a pre-market medication.  CR 24-37.  She conducted such studies for ten years and was doing so at the time of the study in question.  CR 25.  The list of studies she has done is immense.  CR 25-28.

Additionally, in conducting the studies of the medications she has done, Dr. Mulroy monitors for severe adverse events just as Dr. Holcomb and DRG would.  CR 29.  Clearly, psychiatric medications have gastroenterological side effects which must be monitored.  It does not though require take the involvement of a gastroenterologist to conduct such studies.  Thus, even though the ailments Ms. Vora incurred were gastroenterological this does not make Dr. Mulroy unqualified to opine on them.  Ms. Vora would direct the Court to the Houston Court of Appeals decision in *Salvato v. Angelo*, No. 14-07-0748-CV,  (Tex.App.—Houston

17

[14[th] Dist.] April 8, 2008, no pet.) In that similar case involving a research study, the court held that the key qualification for a qualified statutory expert was conducting studies and knowing how to identify potential adverse outcomes. Just as the doctor in *Salvato* was qualified so is Dr. Mulroy here.

Instead, Appellants seek to apply an impossible standard, as set forth in the brief on page 22, that because Dr. Mulory is not familiar with adverse effects of the long term use of linaclotide that she cannot opine here. There is no way to meet that standard as the drug at issue was experimental at the time Ms. Vora used it. Of course, there is not a body of research that Dr. Mulroy can rely upon from 2011 on this issue. While the bar may be high for an expert to qualify under Chapter 74, the bar cannot be set where not party can achieve it.

What qualifies Dr. Holcomb and DRG to conduct such studies is that they adhere to the standard of care for a physician or institute conducting such studies— not that the condition the drug is being used to treat. Dr. Mulroy knows those standards of care and they are the same for whatever drug is being studied. The trial court did not abuse its discretion in denying the motion to dismiss on Dr. Mulroy's qualifications.

**V. DR. MULROY PROPERLY EXPLAINED THE CAUSAL RELATIONSHIP BETWEEN THE CONDUCT AT ISSUE AND MS. VORA'S INJURIES**

Appellants complain that Mulroy's report is conclusory. In reality, what is at issue is that Dr. Mulroy's opinion is so straightforward. When a patient is hospitalized, in this case repeatedly, for the side effect of the medication being studied then you remove the patient from the study. For Dr. Holcomb and DRG to now challenge that conclusion is wholly spurious as that is what did after Ms. Vora's third hospitalization for gastrointestinal issues while on the study medication. What Dr. Mulroy makes clear in her report is that it never should have taken three hospitalizations to reach this point and that after the first hospitalization or the second hospitalization for the side effects being studied, Ms. Vora should have been removed from the study. Dr. Mulroy states, "a hospitalization for a potential side effect of a drug that is under study and not yet FDA approved is enough to warrant a decision to remove the patient from the study" (CR 30) and if removed from the study the side effects leading to hospitalization would not have occurred. It does not get much simpler than that—do not let the patient remain in the study to incur the repeated severe adverse events and removing the patient from the study will stop them. The trial court did not abuse its discretion in concluding Dr. Mulroy sufficient explained the causal relationship between the breach of the

standard of care and the damages Ms. Vora suffered.

**VI.** **DR. MULROY'S REPORT WAS A GOOD FAITH EFFORT TO COMPLY WITH THE STATUTE AND THUS MS. VORA SHOULD BE GIVEN THE OPPORTUNITY TO REQUEST TO CURE ANY DEFECTS FOUND BY THIS COURT UPON REMAND**

If this court finds that Dr. Mulroy's report is deficient, it was clearly a good faith effort to comply with the statutory. Thus, this matter should be remanded to allow Ms. Vora to ask the trial court for thirty days to cure any defects in the report. TEX. CIV. PRAC. & REM. CODE § 74.351(c).

## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellee Sushma Vora, asks the Court to affirm the denial of John Holcomb, M.D. and Diagnostics Research Group's motion to dismiss. Alternatively, should the Court find that Dr. Mulroy's report is, in any way, defective that Sushma Vora would ask the Court to remand the matter for consideration of a motion to allow Ms. Vora to cure any defects under Section 74.351(c). Appellee further prays for such other relief to which they may be entitled consistent with this Court's opinion.

20

Respectfully submitted,

*/s/ Christopher J. Deeves*

**CHRISTOPHER J. DEEVES**
State Bar No. 00790575

**THE LAW OFFICE OF
CHISTOPHER DEEVES, P.C.**
1370 Pantheon Way, Suite 110
San Antonio, Texas  78232
(210) 445-8807 (Telephone)
(210) 501-0915 (Facsimile)
chrisdeeves@att.net (e-mail)

**ATTORNEY FOR APPELLEE,
SUSHMA VORA**

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 3,522 words (excluding the caption, table of contents, table of authorities, signature, proof of service, certification, and certificate of compliance). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

*/s/ Christopher J. Deeves*
CHRISTOPHER J. DEEVES

## CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the above and foregoing document was served as indicated to the following counsel of record listed below on April 8, 2015:

Brett B. Rowe
Matthew M. Edwards
Christine Herrera
Evans, Rowe & Holbrook, P.C.
10101 Reunion Place, Suite 900
San Antonio, Texas 78216

***Via Facsimile or Electronic Service*:**
ATTORNEY FOR APPELLANTS
DIAGNOSTIGS RESEARCH GROUP, L.L.C. AND
JOHN R. HOLCOMB, M.D.

*/s/ Christopher J. Deeves*
CHRISTOPHER J. DEEVES

# **APPENDIX**

ORDER
MULROY REPORT
MULROY CV
SALVATO

DOCUMENT SCANNED AS FILED

2013CI00357 -D407

CAUSE NO. 2013-CI-00357

| | | |
|---|---|---|
| SUSHMA VORA | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| FOREST LABORATORIES, INC, | § | 407TH JUDICIAL DISTRICT |
| FOREST RESEARCH INSTITUTE, | § | |
| INC., IRONWOOD | § | |
| PHARMACEUTICALS | § | |
| CORPORATION, | § | |
| DIAGNOSTIC RESEARCH GROUP, | § | |
| AND JOHN R. HOLCOMB, M.D. | § | BEXAR COUNTY, TEXAS |

**ORDER ON DEFENDANTS, JOHN R. HOLCOMB, M.D. and
DIAGNOSTIC RESEARCH GROUP, L.L.C.'s OBJECTIONS TO THE
QUALIFICATIONS AND REPORT OF AMY EDMONDSON MULROY, M.D. AND
MOTION TO DISMISS**

On the 27th day of March, 2014, came on to be heard Defendants John R. Holcomb, M.D. and Diagnostic Research Group, L.L.C.'s Objections to the Qualifications and Report of Amy Edmondson Mulroy, M.D. and Motion to Dismiss. The Court, after having reviewed the pleadings, report, Objections and Motion to Dismiss and after having heard the argument of counsel, OVERRULES the Objections, DENIES the Motion, and FINDS the following:

As to Defendant Diagnostic Research Group, L.L.C., this suit brought against it by Plaintiff is not a Health Care Liability Claim as defined by TEXAS CIVIL PRACTICE AND REMEDIES CODE § 74.001 (a) (13).

The case regards the issue of whether the Defendants were negligent in not removing Plaintiff from the study of a drug.

As to Defendant John R. Holcomb, M.D., the suit brought against him by Plaintiff is a Health Care Liability Claim as defined by TEXAS CIVIL PRACTICE AND REMEDIES CODE § 74.001 (a)

1

DOCUMENT SCANNED AS FILED

(13). Further, the TEXAS CIVIL PRACTICE AND REMEDIES CODE § 74.351 Expert Report of Amy Edmondson Mulroy, M.D. is adequate as to Dr. Holcomb as it puts him on notice of the claims asserted by Plaintiff.

DEC 3 0 2014

SIGNED AND ENTERED THIS _____ day of October, 2014.

_____

HONORABLE LARRY NOLL

_____

CHRISTOPHER J. DEEVES
State Bar No. 00790575
THE LAW OFFICE OF CHRISTOPHER DEEVES, P.C.
1370 Pantheon Way
Suite 110
San Antonio, TX 78232
ATTORNEY FOR PLAINTIFF
SUSHMA VORA

_____

BRETT B. ROWE
State Bar No. 17331750
MATTHEW M. EDWARDS
State Bar No. 24032034
LAURA FLORES MACOM
State Bar No. 24002512
EVANS ROWE & HOLBROOK, P.C.
10101 Reunion Place Blvd., Suite 900
San Antonio, Texas 78216
ATTORNEYS FOR DEFENDANTS
DIAGNOSTIC RESEARCH GROUP, L.L.C. AND
JOHN R. HOLCOMB, M.D.

2

# AMY MULROY, MD, PA

*Adult Psychiatry*

May 6, 2013


Christopher J. Deeves
The Law Office of Christopher J. Deeves
1370 Pantheon Way, Suite 110
San Antonio, Texas 78232

Re: Treatment of Sushma Vora

Dear Mr. Deeves,

You have asked me to review the conduct of Dr. John Holcomb ("Dr. Holcomb"), Diagnostics Research Group and Forest Research Institute with regard to Sushma Vora's ("Ms. Vora") participation in an open label study of the drug linaclotide. All of my opinions in this letter are based upon a reasonable degree of medical probability.

I am familiar with the standard of care owed by Dr. Holcomb, Diagnostics Research Group and Forest Research Institute in conducting an open label study of a pre-market medication. I am of the opinion as set forth below that Dr. Holcomb, Diagnostics Research Group and Forest Research Institute breached the standard of care and that as a result of this breach Ms. Vora was hospitalized for a third time while participating in the study. Ms. Vora's third hospitalization and the pain and suffering related thereto would have been wholly prevented if Dr. Holcomb, Diagnostic Research Group and Forest Research Institute had withdrawn Ms. Vora from the study after her first two hospitalizations for side effects related to the study medication which the standard of care required them to do.

I graduated from medical school at the University of Texas Health Science Center San Antonio ("UTHSCSA") in 1993. I then completed my residency in psychiatry at the UTHSCSA in 1997. I am a licensed physician in the State of Texas and have been since 1994.

After completing my residency, I held the position of Assistant Professor in the department of Psychiatry at UTHSCSA. I became board certified in Psychiatry and Neurology in 1998. I served as adjunct faculty at UTHSCSA from 1997 to 2001. During my time on faculty at UTHSCSA I served as sub-investigator on a number of research studies. I entered private practice in 2001.

In additional to my private practice, I served as principal investigator in a number of studies of pre-market medications with Clinical Trials of Texas. I was actively involved in such studies from 2003 to 2012. I was conducting such studies as an investigator during the time period from January 2011 to July 2011.

I have conducted the following open label studies as an investigator:

2009-2010: A 28 week, open-label, safety, extension trial of "study drug" daily in premenopausal and naturally postmenopausal women with hypoactive sexual desire disorder in North America

2009-2010: A Long term, open label extension study of "study drug" in Adult patients with Major Depressive Disorder

2009-2010: A phase 2, multicenter, open-label study to assess the safety and tolerability of "study drug" as adjunctive therapy in adult patients with Major depressive disorder

2009-2010: A Long term, open label extension study of "Study Drug" as adjunctive therapy in Adult patients with Major Depressive Disorder

2005-2006: A 12 Week, Multi-Center, Open Label Study to Evaluate the Effectiveness and Safety of "Study Drug" in Hispanic Patients with Mild to Moderate Alzheimer's Disease

1998-1999: An Open Label Extension Study of "study drug" in the Treatment of Signs and Symptoms of Mania in Elderly Patients with Dementia

2010-2012: Long-Term, Open-Label, Safety Study Of "Study Drug" As Adjunctive Treatment For Patients With Major Depressive Disorder Who Are Partial Responders To Selective Serotonin Reuptake Inhibitor Treatment

2010-2012: An Open-Label, Multi-Center, Three Phase, Sequential Design, Single And Multiple Dose Study To Assess The Safety, Tolerability, And Pharmacokinetic Profile Of An Enteric Coated Once-Weekly Oral Formulation Of "Study Drug" Administered To Children And Adolescents With Tourette's Disorder

2009-2012: A Long-Term, Open-Label Extension Study of "Study Drug" In Adult Patients With Major Depressive Disorder

I have conducted the following double blind studies as an investigator:

2011-2012: The "Protocol Number" Phase 3, Multicenter, Randomized, Double-Blind, Parallel-Group, Placebo-Controlled, Flexible Dose Titration, Efficacy And Safety Study Of "Study Drug" In Combination With An Antidepressant In The Treatment Of Adults With Major Depressive Disorder With Inadequate Response To Prospective Treatment With An Antidepressant.

2011-2012: A Phase 3, Randomized, Double-Blind, Parallel-Group, Placebo-Controlled, Fixed-Dose Study Comparing The Efficacy And Safety Of 2 Doses Of "Study Drug" In Acute Treatment Of Adults With Major Depressive Disorder

*11124 Wurzbach, Suite 305 • San Antonio, TX 78230 • 210-692-1929 phone • 210-692-1904 fax*

2011-2012: A Phase 2, Double-Blind, Randomized, Placebo-Controlled, Two-Period Crossover Study To Evaluate The Efficacy And Safety Of "Study Drug" For The Treatment Of Tardive Dyskinesia In Subjects With Schizophrenia Or Schizoaffective Disorder

2011-2012: A Multicenter, Randomized, Double-Blind, Parallel Group, Placebo-Controlled, Phase III Efficacy And Safety Study Of "Study Drug" In Flexible Doses As An Adjunct To An Antidepressant In Patients With Major Depressive Disorder Who Exhibit An Inadequate Response To Antidepressant Therapy

2011-2012: A Multicenter, Randomized, Double-Blind, Parallel Group, Placebo-Controlled, Phase III, Efficacy And Safety Study Of 3 Fixed Dose Groups Of "Study Drug" As An Adjunct To An Antidepressant In Patients With Major Depressive Disorder Who Exhibit An Inadequate Response To Antidepressant Therapy

2011-2012: A Multi-Center, Randomized, Double-Blind, Placebo-Controlled, Parallel Group Study To Evaluate The Efficacy And Safety Of Low-Dose "Study Drug" For Adjunctive Therapy In Adult Patients With Obsessive-Compulsive Disorder Who Have Not Adequately Responded To Treatment With A Selective Serotonin Reuptake Inhibitor

2010-2012: A Phase 2, Multicenter, Randomized, Double-Blind, Placebo-Controlled Study Of The Safety And Efficacy Of "Study Drug" As Adjunctive Therapy In The Treatment Of Adults With Major Depressive Disorder

2009-2012: A 12-Week, Randomized, Double-Blind, Placebo-Controlled, Phase III Safety Trial Of "Study Drug" In Women Taking A Selective Serotonin Or Serotonin-Norepinephrine Reuptake Inhibitor With Decreased Sexual Desire And Distress

2009-2012: A Double-Blind, Placebo-Controlled, Flexible-Dose Study Of "Study Drug" In Patients With Major Depressive Disorder

2009-2012: A Twenty-Four Week, Randomized, Double-Blind, Placebo-Controlled, Safety And Efficacy Trial Of "Study Drug" Administered Orally Once Daily In Premenopausal Women With Hypoactive Sexual Desire Disorder In The United States

2009-2012: A Twenty-Four Week, Randomized, Double-Blind, Placebo-Controlled, Safety And Efficacy Trial Of "Study Drug" Administered Orally Once Daily In Naturally Postmenopausal Women With Hypoactive Sexual Desire Disorder In The United States

2009-2010: A 12 week, randomized, double-blind, placebo-controlled, Phase III safety trial of "Study Drug" tablets in women taking a Selective Serotonin or Serotonin Norepinephrine Reuptake Inhibitor with decreased sexual desire and distress

2009-2010: A Double-blind, placebo-controlled, Flexible dose study of "Study Drug" in patients with Major Depressive Disorder

2008 – 2009: Randomized, Double-blind, Parallel-group. Placebo-controlled, Fixed Dose Study Comparing the Efficacy and Safety of 2 doses of "Study Drug" in the Acute Treatment of Adults with Generalized Anxiety Disorder

2008 – 2009:  Randomized, Double-blind, Parallel-group. Placebo-controlled Study of "Study Drug" in the Treatment of Depression in Patients with Bipolar I or II Disorder

2008 – Randomized, Double-blind, Parallel-group. Placebo-controlled, Fixed Dose Study Comparing the Efficacy and Safety of "Study Drug" in the Acute Treatment of Adults with Major Depressive Disorder

2007 – 2008:  A Multi-center, Randomized, Double-blind, Parallel-group, Placebo-controlled, Fixed Dose Study Comparing the Efficacy and Safety of "Study Drug" Compared with Placebo as an Adjunct to the Treatment in Patients with Generalized Anxiety Disorder who Demonstrate Partial or No Response to a Selective Serotonin Reuptake Inhibitor or Serotonin-Norepinephrine Reuptake Inhibitor Alone or in Combination with a Benzodiazepine

2007 – 2008:  A Multi-center, Randomized, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" as Mono-Therapy in the Treatment of Elderly Patients with Major Depressive Disorder (SAPPHIRE STUDY)

2007 – 2008:  A Multi-center, Randomized, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" as Mono-Therapy in the Treatment of Elderly Patients with Generalized Anxiety Disorder (CHROMIUM STUDY)

2007 – 2008:  A Six Week, Double-blind, Multi-center, Placebo-controlled Study Evaluating the Efficacy and Safety of Flexible Doses of Oral "Study Drug" in Outpatients with Bipolar I Depression

2006 – 2008:  A Multi-center, Randomized, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" as Monotherapy in the Maintenance Treatment of Patients with Generalized Anxiety Disorder Following an Open-Label Stabilization Period (PLATINUM STUDY)

2006 – 2008:  A Multi-center, Randomized, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" in Combination with an Antidepressant in the Treatment of Patients with Major Depressive Disorder with Inadequate Response to an Antidepressant Treatment

2006 – 2007:  A Multi-center, Randomized-Withdrawal, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" as Monotherapy in the Maintenance Treatment of Patients with Major Depressive Disorder Following an Open-Label Stabilization Period (AMETHYST STUDY)

2006 – 2007:  A Multi-center, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" as Monotherapy in the Treatment of Patients with Major Depressive Disorder Following (PEARL STUDY)

2006 – 2007:  A Four-Week, Double-blind, Placebo-controlled Phase III Study of the Efficacy and Safety and Pharmocokinetics of Flexible Doses of Oral "Study Drug" in Children and Adolescents with Bipolar I Disorder (Manic or Mixed)

2005-2006:  A 12 Week, Multi-Center, Open Label Study to Evaluate the Effectiveness and Safety of "Study Drug" in Hispanic Patients with Mild to Moderate Alzheimer's Disease

2005 – A Multi-Centre, Randomized, Double-Blind, Parallel-Group, Placebo-Controlled, Flexible Dose Study to Evaluate the Efficacy, Safety and Tolerability of "Study Drug" in Elderly Subjects with Major Depressive Disorder

2004 – 2005: A Multicenter, Randomized, Double-Blind, Parallel-Group, Placebo-Controlled, Flexible Dose Study to Evaluate the Efficacy, Safety and Tolerability of "Study Drug" in Elderly Subjects with Major Depressive Disorder.

2004: A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group Study to Assess the Safety, Tolerability, and Efficacy of Titration and Treatment with "Study Drug" in Subjects with Mild Cognitive Impairment (MCI)"

2003 – 2004: A Multicenter, Double-Blind, Randomized, Placebo-Controlled Comparison of the Effects on Sexual Functioning of "Study Drug" in Outpatients with Moderate to Severe Major Depression over an Eight-Week Treatment Period.

2003 – 2004: A Study of (study drug) Versus Escitalopram and Placebo in the Treatment of Patients with Major Depression.

A 24-Week, Multicenter, Randomized, Double-Blind, Placebo-Controlled Evaluation of the Efficacy and Safety of "study drug" in the Patients with Dementia Associated with Cerebrovascular Disease.

A 24-Week, Multicenter, Randomized, Double-Blind, Placebo-Controlled Evaluation of the Efficacy and Safety of "study drug" in the Patients with early Alzheimer's Disease.

"The Efficacy, Safety, and Tolerability of "Study Drug" Versus Placebo, Administered for One Year in patients with Probable Alzheimer's Disease"

"Study Drug" Versus Placebo in the Treatment of Psychosis and Behavioral Disturbances Associated with Alzheimer's Disease"

A Twenty Week, Multicenter, Parallel-Group, Double-Blind, Placebo-Controlled Study of the Efficacy, Tolerability and Safety of Sertaline in the Treatment of the Behavioral Manifestation of Alzheimer's Disease in Outpatients Treated with Donepezil"

"Metrifonate Investigational Nationwide Trial, M.I.N.T."

"A Multicenter, Double-Blind Comparison of Efficacy and Safety of Seroquel (quetiapine fumarate), Haloperidol, and Placebo in the Treatment of Elderly Subjects Residing in Nursing Homes or Assisted Care Facilities and Presenting with Alzheimer's Disease and Psychoses or other Selected Psychoses"

"A Double-Blind, Placebo-Controlled Study of Depakote in the Treatment of signs and Symptoms of Mania in Elderly Patients with Dementia

Due to confidentiality I cannot provide all of the names of the drugs I studied therefore, the name of the drug has been changed to "Study Drug" in the titles of studies included on my CV.

The standards required of a physician conducting studies of experimental medications are the same regardless of what condition and/or symptoms the drug is being used to treat. In other words, the duties owed to a study participant are the same regardless of whether the drug is used to treat a psychiatric illness such as major depressive disorder or one being used to treat as irritable bowel syndrome. The duties owed by a party conducting such a study in San Antonio, Texas are the same regardless of where the entity is located.

One of the primary duties of a principal investigator, a study sponsor and studying facility is to monitor the participant for "severe adverse events." "Severe adverse events" (SAEs) are significant medical problems or outcomes that occur to the patient while in a study. SAEs include hospitalizations. All hospitalizations of a patient during participation in a research study are considered SAEs and must be reported to the sponsor and the Institutional Review Board (IRB) immediately; usually within 24 hours of being notified of the serious adverse event. If a patient reports an SAE, the standard of care requires the principal investigator to assess the symptoms, severity, and outcome to the patient as well as if the patient continues to meet requirements that make him or her an appropriate candidate for research. This assessment and determination must be made immediately and as soon after the presence of an SAE is known. An SAE Report Form must be completed for every SAE that occurs. There are some situations even, that require an SAE to be followed for up to one year after it is resolved.

If an SAE occurs with a patient in a study it is the responsibility of the Principal Investigator to immediately assess the safety of the patient and integrity of the study protocol. SAE report forms often require the Principal Investigator to make a determination as to whether the SAE is likely or unlikely related to the study drug. If an SAE does occur then it is the investigator's job to (1) assess if the patient should be removed from the study and/or (2) very closely monitor the patient thereafter. If the principal investigator makes the decision to retain a patient in a study after an SAE occurs, then it is paramount to closely monitor the patient for the reason the SAE occurred and for any other reason that suggests that the patient is not an appropriate candidate for a research study.

Some of the requirements that suggest that a patient is an appropriate candidate for research include the patient's (1) current medical condition, (2) the past medical history, (3) condition on physical examination, (4) laboratory values collected prior to enrollment in study and during the study at the successive study visits, (5) concomitant medications taken by the patient prior to the study participation and including new medications prescribed to the patient after enrollment in a study, (6) compliance by the patient to the protocol of the study, and (7) prior study participation with other trials. It is the study coordinator's job to convey the protocol requirements to the patient, but ultimately, it is the Principal Investigator's responsibility to oversee all aspects of the study and adherence to the study protocol including a determination in his/her opinion if a study

participant will be able to meet the requirements of the protocol. The investigator must assess if a patient remains an appropriate candidate for research throughout the course of the study. At any time that the investigator determines that a patient cannot meet the requirements of the protocol or is no longer an appropriate candidate for a research study then it is his/her duty to remove that patient from the study. This discretion protects the integrity of the research and of the study.

When there is a case of a patient having more than one SAE in any particular study, then it is paramount for the investigator to highly question the appropriateness of that patient to the study.

I have reviewed the documentation (clinical notes) provided by Diagnostics Research Group/ Dr. Holcomb and the study documentation provided by Forest Research Institute to Ms. Vora concerning Ms. Vora's participation in the open label study of linaclotide. This documentation shows that on February 23, 2011, Ms. Vora reported a "severe adverse event"—hospitalization in January 2011. While the initial notation for this event was pneumonia, Dr. Holcomb changed it to ileus (a bowel condition related to the side effects of linaclotide) in his report to Forest Research Institute. According to the documentation, Forest Research Institute, as the study sponsor, reviewed the information provided by Dr. Holcomb and actively participated in the decision that Ms. Vora continue in the study. The documentation indicates Forest Research Institute blessed the decision for Ms. Vora to continue in the study.

This decision is troubling. Ileus is a bowel or GI problem and is also potential side effect of the medication under study. In my opinion, a hospitalization for a potential side effect of a drug that is under study and not yet FDA approved is enough to warrant a decision to remove the patient from the study. This was not done. In fact, the patient was hospitalized twice more for GI problems while on this study medication. Thus, the three SAEs in Ms. Vora were GI related—the very area being studied.

Because Dr. Holcomb, Diagnostics Research Group and Forest Research Institute kept Ms. Vora in the study after the first SAE, the studying entities and principal investigator had a duty to very closely monitor Ms. Vora. Ms. Vora was hospitalized again for a bowel ailment in March 2011 and none of the entities conducting the study were aware of this. It is clear that Dr. Holcomb, Diagnostics Research Group and Forest Research Institute were not aware of this second SAE because it is not noted until May 23, 2011—after Ms. Vora suffered a third SAE.

It is the duty of an investigator, studying facility and study sponsor to be in close contact and observation of patients that have had one SAE during the time between study visits. This is the only way they can be aware of how the patient is doing. With the case of Ms. Vora unfortunately, two months passed between the second SAE in March 2011

and the discovery of it by Dr. Holcomb, Diagnostics Research Group and Forest Research Institute in May 2011.

Dr. Holcomb, Diagnostics Research Group and Forest Research Institute each had a duty to follow Ms. Vora closely following her first SAE in January 2011. If Dr. Holcomb had followed his patient closely he would have learned of her second SAE which would have required him, the study sponsor and studying facility to remove her from the study following the second related SAE. For either the study sponsor, studying facility or principal investigator to be wholly unaware of a second SAE fell below the standard of standard of care owed by each entity to closely monitor Ms. Vora.

Ms. Vora further reported that she was hospitalized for a third time on or about May 19, 2011 for vomiting and distended abdomen. Linaclotide has the risk associated with that condition. Had Ms. Vora been removed from the study and stopped taking the linaclotide after the second SAE as should have occurred, then she would not have endured the pain and suffering of the third hospitalization.

As such, the third SAE was wholly preventable and should never have happened. Ms. Vora should have been removed from the study no later than March 2011 when the second SAE occurred. If this had been done, then the May 2011 SAE would have been prevented. Indeed, Ms. Vora was removed from the study following the third SAE by Dr. Holcomb, Diagnostic Research Group and Forest Research Institute showing the decision that it was in her best interests to be terminated from participation in the study.

In my opinion, Dr. Holcomb, as principal investigator, breached the standard of care by allowing Ms. Vora to continue in the study of linaclotide after not one but two severe adverse events—the January and March 2011 hospitalizations. If Dr. Holcomb had timely removed her from the study, the third severe adverse event—the May 2011 hospitalization for which Ms. Vora was removed from the study would not have occurred.

In my opinion, Diagnostic Research Group, as the studying facility, breached the standard of care by allowing Ms. Vora to continue in the study of linaclotide after not one but two severe adverse events—the January and March 2011 hospitalizations. If Diagnostic Research Group had timely removed her from the study, the third severe adverse event—the May 2011 hospitalization for which Ms. Vora was removed from the study would not have occurred.

In my opinion, Forest Research Institute, as a study sponsor, breached the standard of care by allowing Ms. Vora to continue in the study of linaclotide after not one but two severe adverse events—the January and March 2011 hospitalizations. If Forest Research Institute had timely removed her from the study, the third severe adverse event—the May

2011 hospitalization for which Ms. Vora was removed from the study would not have occurred.

In sum, I understand that "negligence" means the failure to use ordinary care, that is failing to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. I understand that "proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause, such event would not have occurred. In order to be a proximate cause, the act or omission must be such that a person using ordinary prudence would have foreseen that the event, or some similar event, might reasonably result there from. There may be more than one proximate cause of an event.

Here the proximate cause of the third hospitalization was the continued use of linaclotide. The third hospitalization was for a distended abdomen and vomiting, which was a known risk of the drug. Therefore it was foreseeable that the continued use of the drug would cause distended abdomen and vomiting. Ms. Vora also had already been hospitalized twice for similar injuries while taking the drug, making it foreseeable that continued use of the drug would result in distended abdomen and vomiting. But for the negligence of Dr. Holcomb, Diagnostics Research Group and Forest Research Institute in not monitoring Ms. Vora and not taking Ms. Vora off the drug following the second SAE, in reasonable medical probability, Ms. Vora would not have suffered the distended abdomen and vomiting, or the associated hospitalization and pain and suffering.

Sincerely,

Amy Mulroy, M.D.

# AMY MULROY, MD, PA

*Adult Psychiatry*

## Curriculum Vitae

**Business Address:**

11124 Wurzbach, Suite 305
Oak Ridge Square Offices
San Antonio, TX 78230
Phone: 210-692-1929
Fax: 210-692-1904
Email: dr.mulroy@amymulroymd.com

**Education:**

Texas A&M University, College Station, Texas 1986-1989
Bachelor of Science, Microbiology 117 of 129 hours completed

University of Texas Medical School, San Antonio, Texas 1989-1993
Doctor of Medicine

University of Texas Health Science Center, San Antonio, TX, 1993-1997
General Adult Psychiatry Internship and Residency

**Private Practice:**

February 2001- Present

Diagnosis and treatment of psychiatric conditions in adults with a focus on medication management and brief therapy interventions for the treatment of Major Depressive Disorder, Generalized Anxiety Disorder, Panic Disorder, Obsessive-Compulsive Disorder, Bipolar I and II Disorders, and Dementia Related Illness. Special interest in Addiction Medicine as it relates to psychiatric conditions and mental health as well as 12 step recovery programs.

**Investigator:**

Principal Investigator for Psychiatric Studies with Clinical Trials of Texas (CTT)
2003 – 2012

**Licensure:**

Texas, 1994, #J6417

**Board Certification:**

Diplomat, American Board of Psychiatry and Neurology, November 1998;
Recertification March 2008

**Academic Appointments:**

University of Texas Health Science Center, San Antonio, TX
Assistant Professor, Department of Psychiatry, Jul. 1997/ Feb. 1999

University of Texas Health Science Center, San Antonio, TX
Clinical Assistant Professor, Department of Psychiatry
Mar. 1999/ Feb. 2001

Duties during my employment in the Department of Psychiatry at the University of Texas Health Science Center, San Antonio, TX:

- Course Co-director of Behavioral Science, First Year Medical Students
- Course Co-director of Psychopathology, Second Year Medical Students
- Psychotherapy Advisor for Psychiatry Residents
- Attending Physician at University Health System Mood Disorder Clinic
- Sub-Investigator in Dementia Research

**Professional Organizations:**

| | |
|---|---|
| 1993-2001 | Bexar County Psychiatric Society |
| 1993-2001 | Texas Society of Psychiatric Physicians |
| 1992-2001 | American Psychiatric Association |
| 1992-present | Alpha Omega Alpha Medical Honor Society |
| 1989-2001 | Bexar County Medical Society |
| 1989-2001 | Texas Medical Association |
| 1996-1997 | Texas Society of Psychiatric Physicians |

**Research:**

2011-2012: The "Protocol Number" Phase 3, Multicenter, Randomized, Double-Blind, Parallel-Group, Placebo-Controlled, Flexible Dose Titration, Efficacy And Safety Study Of "Study Drug" In Combination With An Antidepressant In The Treatment Of Adults With Major Depressive Disorder With Inadequate Response To Prospective Treatment With An Antidepressant.

2011-2012: A Phase 3, Randomized, Double-Blind, Parallel-Group, Placebo-Controlled, Fixed-Dose Study Comparing The Efficacy And Safety Of 2 Doses Of "Study Drug" In Acute Treatment Of Adults With Major Depressive Disorder

2011-2012: A Phase 2, Double-Blind, Randomized, Placebo-Controlled, Two-Period Crossover Study To Evaluate The Efficacy And Safety Of "Study Drug" For The Treatment Of Tardive Dyskinesia In Subjects With Schizophrenia Or Schizoaffective Disorder

2011-2012: A Multicenter, Randomized, Double-Blind, Parallel Group, Placebo-Controlled, Phase III Efficacy And Safety Study Of "Study Drug" In Flexible Doses As An Adjunct To An Antidepressant In Patients With Major Depressive Disorder Who Exhibit An Inadequate Response To Antidepressant Therapy

2011-2012: A Multicenter, Randomized, Double-Blind, Parallel Group, Placebo-Controlled, Phase III, Efficacy And Safety Study Of 3 Fixed Dose Groups Of "Study Drug" As An Adjunct To An Antidepressant In Patients With Major Depressive Disorder Who Exhibit An Inadequate Response To Antidepressant Therapy

2011-2012: A Multi-Center, Randomized, Double-Blind, Placebo-Controlled, Parallel Group Study To Evaluate The Efficacy And Safety Of Low-Dose "Study Drug" For Adjunctive Therapy In Adult Patients With Obsessive-Compulsive Disorder Who Have Not Adequately Responded To Treatment With A Selective Serotonin Reuptake Inhibitor

2010-2012: Long-Term, Open-Label, Safety Study Of "Study Drug" As Adjunctive Treatment For Patients With Major Depressive Disorder Who Are Partial Responders To Selective Serotonin Reuptake Inhibitor Treatment

*11124 Wurzbach, Suite 305 • San Antonio, TX 78230 • 210-692-1929 phone • 210-692-1904 fax*

2010-2012: An Open-Label, Multi-Center, Three Phase, Sequential Design, Single And Multiple Dose Study To Assess The Safety, Tolerability, And Pharmacokinetic Profile Of An Enteric Coated Once-Weekly Oral Formulation Of "Study Drug" Administered To Children And Adolescents With Tourette's Disorder

2010-2012: A Phase 2, Multicenter, Randomized, Double-Blind, Placebo-Controlled Study Of The Safety And Efficacy Of "Study Drug" As Adjunctive Therapy In The Treatment Of Adults With Major Depressive Disorder

2009-2012: A 12-Week, Randomized, Double-Blind, Placebo-Controlled, Phase III Safety Trial Of "Study Drug" In Women Taking A Selective Serotonin Or Serotonin-Norepinephrine Reuptake Inhibitor With Decreased Sexual Desire And Distress

2009-2012: A Long-Term, Open-Label Extension Study Of "Study Drug" In Adult Patients With Major Depressive Disorder

2009-2012: A Double-Blind, Placebo-Controlled, Flexible-Dose Study Of "Study Drug" In Patients With Major Depressive Disorder

2009-2012: A Twenty-Four Week, Randomized, Double-Blind, Placebo-Controlled, Safety And Efficacy Trial Of "Study Drug" Administered Orally Once Daily In Premenopausal Women With Hypoactive Sexual Desire Disorder In The United States

2009-2012: A Twenty-Four Week, Randomized, Double-Blind, Placebo-Controlled, Safety And Efficacy Trial Of "Study Drug" Administered Orally Once Daily In Naturally Postmenopausal Women With Hypoactive Sexual Desire Disorder In The United States

2009-2010: A Randomized Controlled Trial To Assess The Efficacy Of A Medical Food In Patients With Mild To Moderate Alzheimer's Disease Using Alzheimer's Disease Medication

2009-2010: A 12 week, randomized, double-blind, placebo-controlled, Phase III safety trial of "Study Drug" tablets in women taking a Selective Serotonin or Serotonin Norepinephrine Reuptake Inhibitor with decreased sexual desire and distress

2009-2010: A Double-blind, placebo-controlled, Flexible dose study of "Study Drug" in patients with Major Depressive Disorder

2009-2010: A Long term, open label extension study of "study drug" in Adult patients with Major Depressive Disorder

2009-2010: A phase 2, multicenter, open-label study to assess the safety and tolerability of "study drug" as adjunctive therapy in adult patients with Major depressive disorder

2009-2010: A Long term, open label extension study of "Study Drug" as adjunctive therapy in Adult patients with Major Depressive Disorder

2008 – 2009: Randomized, Double-blind, Parallel-group, Placebo-controlled, Fixed Dose Study Comparing the Efficacy and Safety of 2 doses of "Study Drug" in the Acute Treatment of Adults with Generalized Anxiety Disorder

2008 – 2009: Randomized, Double-blind, Parallel-group, Placebo-controlled Study of "Study Drug" in the Treatment of Depression in Patients with Bipolar I or II Disorder

2008 – Randomized, Double-blind, Parallel-group, Placebo-controlled, Fixed Dose Study Comparing the Efficacy and Safety of "Study Drug" in the Acute Treatment of Adults with Major Depressive Disorder

2007 – 2008: A Multi-center, Randomized, Double-blind, Parallel-group, Placebo-controlled, Fixed Dose Study Comparing the Efficacy and Safety of "Study Drug" Compared with Placebo as an Adjunct to the Treatment In Patients with Generalized Anxiety Disorder who Demonstrate Partial or No Response to a Selective Serotonin Reuptake Inhibitor or Serotonin-Norepinephrine Reuptake Inhibitor Alone or in Combination with a Benzodiazepine

JML 56-13

2007 – 2008: A Multi-center, Randomized, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" as Mono-Therapy in the Treatment of Elderly Patients with Major Depressive Disorder (SAPPHIRE STUDY)

2007 – 2008: A Multi-center, Randomized, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" as Mono-Therapy in the Treatment of Elderly Patients with Generalized Anxiety Disorder (CHROMIUM STUDY)

2007 – 2008: A Six Week, Double-blind, Multi-center, Placebo-controlled Study Evaluating the Efficacy and Safety of Flexible Doses of Oral "Study Drug" in Outpatients with Bipolar I Depression

2006 – 2008: A Multi-center, Randomized, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" as Monotherapy in the Maintenance Treatment of Patients with Generalized Anxiety Disorder Following an Open-Label Stabilization Period (PLATINUM STUDY)

2006 – 2008: A Multi-center, Randomized, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" in Combination with an Antidepressant in the Treatment of Patients with Major Depressive Disorder with Inadequate Response to an Antidepressant Treatment

2006 – 2007: A Multi-center, Randomized-Withdrawal, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" as Monotherapy in the Maintenance Treatment of Patients with Major Depressive Disorder Following an Open-Label Stabilization Period (AMETHYST STUDY)

2006 – 2007: A Multi-center, Double-blind, Parallel-group, Placebo-controlled Phase III Study of the Efficacy and Safety of "Study Drug" as Monotherapy in the Treatment of Patients with Major Depressive Disorder Following (PEARL STUDY)

2006 – 2007: A Four-Week, Double-blind, Placebo-controlled Phase III Study of the Efficacy and Safety and Pharmocokinetics of Flexible Doses of Oral "Study Drug" in Children and Adolescents with Bipolar I Disorder (Manic or Mixed)

2005-2006: A 12 Week, Multi-Center, Open Label Study to Evaluate the Effectiveness and Safety of "Study Drug" in Hispanic Patients with Mild to Moderate Alzheimer's Disease

2005 – A Multi-Centre, Randomized, Double-Blind, Parallel-Group, Placebo-Controlled, Flexible Dose Study to Evaluate the Efficacy, Safety and Tolerability of "Study Drug" in Elderly Subjects with Major Depressive Disorder

2004 – 2005: A Multicenter, Randomized, Double-Blind, Parallel-Group, Placebo-Controlled, Flexible Dose Study to Evaluate the Efficacy, Safety and Tolerability of "Study Drug" in Elderly Subjects with Major Depressive Disorder.

2004: A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group Study to Assess the Safety, Tolerability, and Efficacy of Titration and Treatment with "Study Drug" in Subjects with Mild Cognitive Impairment (MCI)"

2003 – 2004: A Multicenter, Double-Blind, Randomized, Placebo-Controlled Comparison of the Effects on Sexual Functioning of "Study Drug" in Outpatients with Moderate to Severe Major Depression over an Eight-Week Treatment Period.

2003 – 2004: A Study of (study drug) Versus Escitalopram and Placebo in the Treatment of Patients with Major Depression.

A 24-Week, Multicenter, Randomized, Double-Blind, Placebo-Controlled Evaluation of the Efficacy and Safety of "study drug" in the Patients with Dementia Associated with Cerebrovascular Disease.

A 24-Week, Multicenter, Randomized, Double-Blind, Placebo-Controlled Evaluation of the Efficacy and Safety "study drug" in the Patients with early Alzheimer's Disease.

"The Efficacy, Safety, and Tolerability of "Study Drug" Versus Placebo, Administered for One Year in patients with Probable Alzheimer's Disease"

"Study Drug" Versus Placebo in the Treatment of Psychosis and Behavioral Disturbances Associated with Alzheimer's Disease"

A Twenty Week, Multicenter, Parallel-Group, Double-Blind, Placebo-Controlled Study of the Efficacy, Tolerability and Safety of Sertaline in the Treatment of the Behavioral Manifestation of Alzheimer's Disease in Outpatients Treated with Donepezil"

"Metrifonate Investigational Nationwide Trial, M.I.N.T."

"A Multicenter, Double-Blind Comparison of Efficacy and Safety of Seroquel (quetiapine fumarate), Haloperidol, and Placebo in the Treatment of Elderly Subjects Residing in Nursing Homes or Assisted Care Facilities and Presenting with Alzheimer's Disease and Psychoses or other Selected Psychoses"

"A Double-Blind, Placebo-Controlled Study of Depakote in the Treatment of signs and Symptoms of Mania in Elderly Patients with Dementia"

"An Open Label Extension Study of Depakote in the Treatment of Signs and Symptoms of Mania in Elderly Patients with Dementia"

**PATRICIA D. SALVATO, M.D. AND DIVERSIFIED MEDICAL PRACTICES, PA, Appellants**

**v.**

**FAUSTINA ANGELO, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ARTHUR LEON ANGELO, JR., DECEASED, LUCAS ANGELO, SOFIA ANGELO, ARTHUR ANGELO, SR. AND CONNIE ANGELO, Appellees**

**No. 14-07-00784-CV**

**Court of Appeals of Texas, Fourteenth District**

**April 8, 2008**

On Appeal from the 281st District Court Harris County, Texas Trial Court Cause No. 2007-02024.

Panel consists of Chief Justice Hedges, and Justices Anderson and Boyce.

#### MEMORANDUM OPINION

William J. Boyce, Justice

In this interlocutory appeal, appellants Patricia D. Salvato, M.D. and Diversified Medical Practices, PA (collectively "Dr. Salvato") appeal the trial court's denial of a motion to dismiss a medical malpractice action. *See* Tex. Civ. Prac. & Rem. Code Ann. ' 74.351 (Vernon 2005). Dr. Salvato contends the expert report served by appellees Faustina Angelo, individually and as representative of the estate of Arthur Leon Angelo, Jr., deceased, Lucas Angelo, Sofia Angelo, Arthur Angelo, Sr., and Connie Angelo (collectively "Angelo") was insufficient. Finding no abuse of discretion, we affirm.

#### I. Background

On December 14, 2000, Arthur Angelo, a body-builder with a history of anabolic steroid use, came to Dr. Salvato for treatment of low testosterone levels and generalized anxiety disorder. Mr. Angelo was informed that he could receive prescriptions for anabolic steroids only if he joined a clinical study being conducted by Dr. Salvato focusing on the efficacy of anabolic steroids in HIV/AIDS patients suffering from wasting syndrome. Mr. Angelo volunteered and was enrolled as a member of the control group in Dr. Salvato's clinical study. The initial study included the prescription of anabolic steroids and human growth hormone over a nine-month period, beginning on December 14, 2000. Following the initial nine-month study, Dr. Salvato enrolled Mr. Angelo in extensions over the next several years. In addition to anabolic steroids and human growth hormone, Dr. Salvato also prescribed Valium to Mr. Angelo for pain.

Mr. Angelo exhibited side effects of steroid use during the study, including hypertension, testicular atrophy, worsening anxiety, and insomnia. Mr. Angelo also complained of chest discomfort and exhibited signs of left ventricular hypertrophy in ECG readings that showed elevated QRS voltage attributable to left ventricular hypertrophy.[1] Dr. Salvato continued to prescribe anabolic steroids and human growth hormones to Mr. Angelo.

Mr. Angelo last communicated with Dr. Salvato concerning his treatment sometime between March 1, 2004 and September 7, 2004. Mr. Angelo was found dead in his home on October 31, 2004. Mr. Angelo's death was attributed to hypertensive and atherosclerotic cardiovascular disease.[2]

Suit was filed on January 11, 2007, contending that Dr. Salvato was negligent in prescribing medications which were inappropriate, unlawful, and not in accordance with the standards of medical care in and around Harris County, Texas at the time. It was further alleged that these acts and omissions were the proximate cause of Arthur Angelo's death.

Pursuant to statute, an expert report from Nancy Campbell, M.D. was timely served on May 3, 2007. *See* Tex. Civ. Prac. & Rem. Code Ann. " 74.351, 74.401 (Vernon 2005). In that report, Dr. Campbell opined that Dr. Salvato departed from the normal standard of care by (1) failing to obtain IRB approval[3] and continuing review of the clinical study; (2) failing to maintain an adverse event log; (3) failing to maintain records of proper oversight and monitoring by another party; (4) continuing to prescribe anabolic steroids for more than three years despite the appearance of known side effects of anabolic steroid use in Mr. Angelo's examinations; (5) failing to conduct necessary lab work related to known side effects of anabolic steroid use; and (6) failing to conduct further tests when medical examinations indicated and Mr. Angelo reported signs of heart disease. Dr. Campbell further opined that Dr. Salvato's continued prescription of anabolic steroids led to cardiomegaly[4] with left ventricular hypertrophy and stenosis of 70% of the left anterior descending coronary artery, which in turn led to Mr. Angelo's death from hypertensive and atherosclerotic cardiovascular disease.

Dr. Salvato moved to dismiss Angelo's suit in trial court under section 74.351(b).[5] The trial court denied the motion to dismiss.

Dr. Salvato contends on appeal that Dr. Campbell's expert report does not satisfy sections 74.351 and 74.401. Dr. Salvato contends that (1) Dr. Campbell is not qualified to opine on key issues in this case; and (2) Dr. Campbell's report is deficient because it is conclusory

with regard to the standard of care and causation.

## II. Appellate Jurisdiction

We first consider this court's appellate jurisdiction. This is a question of law reviewed *de novo. State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007).

When, as here, a trial court has not signed a final and appealable order, we may not proceed unless an interlocutory appeal is allowed. *Tex. A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007). When reviewing a statutory grant of interlocutory appellate jurisdiction, we look to the legislature's intent as expressed in the statute's plain words and consider disputed provisions in context. *See id.*; *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). Civil Practice and Remedies Code section 51.014 governs appeals from interlocutory orders; it should be strictly construed as "a narrow exception to the general rule that only final judgments and orders are appealable." *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 355 (Tex. 2001).

Section 51.014(a)(9) allows an immediate appeal from an interlocutory order that "denies all or part of the relief sought by motion under section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351."[6] Tex. Civ. Prac. & Rem. Code Ann. ' 51.014(a)(9) (Vernon Supp. 2007). In turn, section 74.351(b) states:

(b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

(1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

(2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(b) (Vernon Supp. 2007).

Angelo argues that an interlocutory appeal is not available for the denial of Dr. Salvato's motion to dismiss. Angelo seizes on this statement from Dr. Salvato's brief: "This interlocutory appeal seeks relief from the August 6, 2007 denial of Appellants' Motion to Dismiss filed pursuant to Tex. Civ. Prac. & Rem. Code ' 74.351(c) for failure to serve a competent expert report as required by ' 74.351(a) in this healthcare liability claim." Based on this statement, Angelo contends that Dr. Salvato challenged the sufficiency of Dr. Campbell's report only under section 74.351(c). Angelo seeks dismissal of this appeal, arguing that the interlocutory

appeal statute authorizes immediate appellate review of an order denying dismissal under section 74.351(b) based on the failure to file a report - but not an order denying dismissal under section 74.351(c) based on the filing of a deficient report.

Angelo's argument fails for two reasons. First, Dr. Salvato specifically invoked section 74.351(b) in the motion to dismiss filed in the trial court. Second, this court already has held that the denial of a motion to dismiss based upon an assertedly deficient report under section 74.351(c) is appealable under section 51.014(a)(9), reasoning that "[a]n expert report 'has not been served, for purposes of section 74.351(b), if elements of the report are found to be deficient.'" *Group v. Vicento,* 164 S.W.3d 724, 726 n.2 (Tex. App.-Houston [14th Dist.] 2005, pet. filed). Therefore, this court has jurisdiction to review the denial of Dr. Salvato's motion to dismiss a timely served but allegedly deficient expert report.[7]

## III. Sufficiency of the Expert Report

### A. Standard of Review

Dr. Salvato contends the trial court erred in failing to dismiss the case with prejudice because Angelo's expert report from Dr. Campbell is deficient. Dr. Salvato contends the report is deficient because Dr. Campbell is not qualified to opine in this case, and because portions of her expert report are conclusory.

We review a trial court's determination under section 74.351 for abuse of discretion. *Larson v. Dowing*, 197 S.W.3d 303, 304-305 (Tex. 2006); *Mem'l Herman Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 757 (Tex. App.-Houston [14th Dist.] 2007, no pet.). Similarly, we review a trial court's ruling regarding the adequacy of an expert report for abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001); *Group*, 164 S.W.3d at 727. A trial court commits an abuse of discretion when it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Dowing*, 197 S.W.3d at 304-305; *Jernigan v. Langley*, 195 S.W.3d 91, 94 (Tex. 2006). Under this standard, an appellate court may not substitute its judgment for that of the trial court. *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.-Houston [1st Dist.] 2006, no pet.).

Analysis of expert qualifications under section 74.351 is limited to the four corners of the expert's report and the expert's curriculum vitae. *See Palacios*, 46 S.W.3d at 878; *Mem'l Herman Healthcare Sys.*, 230 S.W.3d at 758; *Gray*, 189 S.W.3d at 859. Qualifications cannot be inferred, but must be present in the expert report. *See Olveda v. Supulveda*, 141 S.W.3d 679, 683 (Tex. App.-San Antonio 2004, pet. denied); *Hansen v. Starr*, 123 S.W.3d 13, 19 (Tex. App.-Dallas 2003, pet. denied). To be qualified to provide opinion testimony

regarding whether a physician departed from the accepted standard of health care, an expert must satisfy section 74.401. *See* Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(r)(5)(A) (Vernon 2005). Section 74.401 provides:

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

Tex. Civ. Prac. & Rem. Code Ann. ' 74.401(a) (Vernon 2005).

Under section 74.351, health care liability claimants must provide an expert report to the defendant no later than 120 days after filing the original petition. *See* Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(a) (Vernon Supp. 2007). A defendant may file a motion challenging the adequacy of the report; the trial court should grant the motion only when it appears that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *See* Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(l) (Vernon Supp. 2007).

When determining if a good faith effort has been made, the trial court is limited to the four corners of the report and cannot consider extrinsic evidence. *See Palacios*, 46 S.W.3d at 878; *Mem'l Herman Healthcare Sys.*, 230 S.W.3d at 758; *Gray*, 189 S.W.3d at 859 ("in assessing the report's sufficiency, the trial court may not draw any inferences, and must instead rely exclusively on the information contained within the report's four corners"). An expert report must provide a fair summary of the expert's opinion regarding (1) the applicable standard of care; (2) the manner in which the care provided failed to meet that standard; and (3) the causal relationship between the failure and the injury, harm or damages claimed. *See* Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(r)(6) (Vernon Supp. 2007); *Patel,* 237 S.W.3d at 904.

To satisfy these standards, the expert report must include enough information to satisfy two requirements. The report must (1) inform the defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude the claims are meritorious. *Palacios*, 46 S.W.3d at 879; *Patel,* 237 S.W.3d at 904. "A report merely expressing the expert's conclusions concerning the standard of care, breach, and causation fails to fulfill these purposes." *Patel,* 237 S.W.3d at 904 (citing *Palacios*, 46 S.W.3d at 879). The expert's report need not identify all evidence necessary to litigate the merits of the plaintiff's case, but it must link the expert's opinions on these elements to the facts in the case. *Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879.

### B. Dr. Campbell's Qualifications

Angelo contends that Dr. Salvato was negligent in prescribing anabolic steroids to Mr. Angelo as part of her clinical study of the effects of anabolic steroids on HIV/AIDS patients suffering from wasting syndrome. Angelo further contends that these acts and omissions were the proximate cause of Mr. Angelo's death. Angelo relies on Dr. Campbell to support these contentions.

Angelo retained Dr. Campbell to review the medial records from Dr. Salvato's office, the autopsy report from the medical examiner, and the death certificate. Based upon these records, and her experience, training, knowledge, and qualifications as a physician, Dr. Campbell opined that Dr. Salvato departed from the normal standard of care by (1) failing to obtain IRB approval and continuing review of the clinical study; (2) failing to maintain an adverse event log; (3) failing to maintain records of proper oversight and monitoring by another party; (4) continuing to prescribe anabolic steroids to Mr. Angelo for more than 40 months despite the appearance of known side effects of anabolic steroid use; (5) failing to conduct necessary lab work related to known side-effects of anabolic steroid use; and (6) failing to conduct further tests when medical examinations indicated and Mr. Angelo reported signs of heart disease. Dr. Campbell further opined that Dr. Salvato's continued prescription of anabolic steroids led to cardiomegaly with left ventricular hypertrophy and stenosis of 70% of the left anterior descending coronary artery; this in turn caused Mr. Angelo's death from hypertensive and atherosclerotic cardiovascular disease.

Under section 74.401(a), only a physician can opine as an expert against another physician. It does not follow, however, that every physician is a qualified expert. *See Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). While "expert qualifications should not be too narrowly drawn . . . given the increasing specialization and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question." *Larson*, 197 S.W.3d at 305 (citing *Broders*, 924 S.W.2d at 152). However, when a subject matter is common to and equally recognized in all fields of practice, any physician familiar with the subject may testify as to the standard of care. *See Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.-Houston [1st Dist.] 2002, pet. denied). Likewise, where two fields of medicine overlap, and a procedure is common to more than one

field, a physician in one of these fields may opine as to the standard of care for that procedure in the other field. *Id.*

Dr. Campbell's curriculum vitae recites that she spent three years in residency at Memorial Hospital Southwest, and that she has been board certified in family practice for more than 13 years. She states that her opinions in the report are based upon her experience, training, knowledge, and qualifications as a physician. As a board certified family practitioner who has been an active staff member of Memorial Hospital Southwest for more than a decade, has been Medical Director of Brenco Research, and has conducted more than 100 clinical studies, Dr. Campbell has experience in treating patients with a wide range of maladies. Dr. Campbell described her knowledge regarding the standard of care governing clinical studies like the one conducted by Dr. Salvato, and regarding the monitoring of cardiovascular health for each participant as part of the overseeing physician's responsibility. We cannot say that the trial court abused its discretion in concluding that Dr. Campbell demonstrated sufficient qualifications to opine about standards of care in connection with monitoring the health, including cardiovascular health, of patients participating in clinical studies.

Dr. Salvato concedes that Dr. Campbell may be qualified to opine about the standard of care governing Dr. Salvato's research methodology and findings. Dr. Salvato nonetheless maintains that Dr. Campbell is not qualified to opine about standards of care governing the prescribing of anabolic steroids or about cardiovascular disease. Dr. Salvato contends that Dr. Campbell is not a cardiologist and lacks other experience that would qualify her to give expert testimony on the treatment of cardiovascular disease; Dr. Salvato also emphasizes that Dr. Campbell is not an endocrinologist, and asserts that she is not otherwise qualified to testify about the side effects of anabolic steroids. While Dr. Salvato concedes that some family practitioners might be qualified to opine about steroid use or cardiovascular disease, Dr. Salvato contends that Dr. Campbell's curriculum vita and report fail to establish her particular experience or qualifications to opine on these areas of medical expertise. Dr. Salvato's contentions fall short of establishing an abuse of discretion. "Despite the fact that we live in a world of niche medical practices and multilayer specializations, there are certain standards of medical care that apply to multiple schools of practice and any medical doctor." *Blan v. Ali,* 7 S.W.3d 741, 746 (Tex. App.-Houston [14th Dist.] 1999, no pet.).

The facts in *Blan* are instructive. The physician at issue properly was able to opine about the standard of care for a stroke patient, and was not purporting to offer expert medical opinions peculiar to the field of cardiology. For that reason, the trial court in *Blan* abused its discretion by excluding the expert's testimony about the standard of care when his testimony concerned a matter common to all physicians. *Id.*; *see also McKowen v. Ragston,* S.W.3d, 2007 WL79330, at *5 (Tex. App.-Houston [1st Dist.] Jan. 11, 2007, no pet.) (when "the subject of inquiry is common to and equally recognized and developed in all fields of practice, then any physician familiar with the subject may testify as to standard of care") (citing *Sears v. Cooper*, 574 S.W.2d 612, 614 (Tex. App.-Houston [14th Dist.] 1978, writ ref'd n.r.e.)).

Here, the trial court acted within its discretion by applying this teaching and concluding that Dr. Campbell is qualified to opine about specific areas - such as the conduct of a clinical study and cardiac health - that are common to multiple fields of practice.

Dr. Campbell's curriculum vitae and report also provide a reasonable basis for the trial court to have concluded that Dr. Campbell is qualified to opine about the effects of hormones. Dr. Salvato acknowledged at oral argument that one need not necessarily be an endocrinologist to address issues regarding the effects of hormones. Dr. Campbell's curriculum vitae demonstrates experience with clinical studies involving hormone-related research. These studies include research regarding the prescription of Eclomiphene to treat low testosterone in men and parathyroid hormone studies in women. Thus, while Dr. Campbell is not an endocrinologist, she provides sufficient evidence of her knowledge in connection with studies prescribing and monitoring hormones in patients. *See McKowen* , S.W.3d, 2007 WL79330, at *5 ("A medical witness from one practice area may be qualified to testify if he has practical knowledge of what is customarily done by other practitioners under circumstances similar to those at issue in the case")*; Blan,* 7 S.W.3d at 745 (the emphasis is on the plaintiff's condition, not the defendant's expertise, and physician expert need not be a specialist to opine).

The trial court found that Dr. Campbell is qualified to opine as an expert on medical treatment of Mr. Angelo. The trial court's decision comported with guiding principles and rules governing sufficiency of expert reports. The trial court acted within its discretion. *See Larson*, 197 S.W.3d at 304-05 ("expert qualifications should not be too narrowly drawn;" in a close call, the decision as to whether expert testimony qualifies must go to the trial court).

We overrule Dr. Salvato's first issue.

### C. Standard of Care and Causation

Dr. Salvato argues next that the expert report is deficient. Dr. Salvato argues that Dr. Campbell's report does not set forth the standard of care for conducting a clinical study or for prescribing anabolic steroids. Dr. Salvato claims that Dr. Campbell's report does not "convincingly tie the alleged departure from the standard of care to specific facts of the case." Dr. Salvato argues

that because Dr. Campbell's report does not set forth a standard of review, it does not inform Dr. Salvato as to how he breached that standard of care. Dr. Salvato also contends that Dr. Campbell's report does not link the allegations of negligence to the damages Angelo claims. Dr. Salvato therefore concludes that Dr. Campbell's opinions concerning causation are impermissibly conclusory.

An expert report need not marshal all of the plaintiff's proof, but it must include the expert's opinions on the three statutory elements - standard of care, breach, and causation. *Gray*, 189 S.W.3d at 859. Likewise, a trial court shall grant a motion challenging the adequacy of a report only if it appears to the court that the report does not represent a good faith effort to comply with the definition of an expert report in section 74.351(r)(6). *See* Tex. Civ. Prac. & Rem. Code ' 74.351(l) (Vernon Supp. 2007); *Palacios*, 46 S.W.3d at 879 (if any of the three statutory elements are missing, the report is not a good faith effort). An expert report must provide enough information to fulfill two purposes to constitute an objective good faith effort. The report must inform the defendant of the specific conduct the plaintiff has called into question, and it must provide a basis for the trial judge to conclude the claims have merit. *See Palacios*, 46 S.W.3d at 878-79; *Baylor Univ. Med. Ctr. v. Biggs*, 237 S.W.3d 909, 916-17 (Tex. App.-Dallas 2007, pet. filed); *Gray*, 189 S.W.3d at 859.

Applying these precepts in light of the standard of review, we conclude that the trial court acted within its discretion in concluding that Dr. Campbell's report provided sufficient specificity regarding the standard of care and causation.

Dr. Campbell's report addresses the standard of care required for a clinical study in which the physician is prescribing a medication with known side effects. Dr. Campbell describes the proper conduct of a clinical study, noting the FDA's requirement of IRB approval of any clinical study; the need for oversight; the need to monitor the patient's health; the need to record potential adverse effects; the preeminence of patient health throughout; the need to determine the cause of apparent adverse health indicators; and the need to withdraw a patient from a study when that patient demonstrates indicators of adverse health. Dr. Campbell opines as to the standard of care required for any doctor prescribing medicine to a patient, especially with heart disease symptoms like those exhibited by Mr. Angelo, including the need for further tests, proper diagnosis, and cessation of the test medication.

Dr. Campbell opined that Dr. Salvato's continued prescription of anabolic steroids when Mr. Angelo was experiencing "known toxic side-effects of those steroids" was a breach of the standard of care for a doctor conducting a clinical study and having the obligation to put the health of the participant first. Dr. Campbell's

report gives Dr. Salvato adequate notice of the alleged breaches of the standard of care in her treatment of Mr. Angelo during his participation in Dr. Salvato's clinical study. *See Palacios*, 46 S.W.3d at 878-79; *Biggs*, 237 S.W.3d at 916-17; *Gray*, 189 S.W.3d at 859.

Dr. Campbell's report does not state conclusions without reference to the underlying facts upon which she has premised her opinion. *Patel*, 237 S.W.3d at 904 (citing *Palacios*, 46 S.W.3d at 879). She links each element of the standard of care in the treatment of a participant in a clinical study to the facts of the case, noting where and how Dr. Salvato departed from that standard of care. Dr. Campbell opined that Dr. Salvato failed to correctly monitor Mr. Angelo. As an example, she focused on Dr. Salvato's failure to monitor Mr. Angelo's lipid levels in light of the known increase in lipid levels associated with anabolic steroid use that were noted in Dr. Salvato's notes. Dr. Campbell opined that Dr. Salvato assessed Mr. Angelo's lipid levels in 2001, but then failed to do so for the following three years. Dr. Campbell noted that Dr. Salvato failed to monitor lipid levels even while aware that it was important for cardiac health to watch them. Dr. Campbell's report noted that Mr. Angelo suffered chest pains, elevated blood pressure, and increased QRS voltage, all symptoms of heart disease. Dr. Salvato's notes also revealed that Mr. Angelo complained of worsening anxiety, insomnia, and testicular atrophy, all known side effects of anabolic steroid abuse. Dr. Campbell noted that no adverse event log was maintained; that symptoms of cardiac disease were overlooked or mis-diagnosed; and that Mr. Angelo was prescribed additional steroids. Even when Mr. Angelo was diagnosed with hypertension, Dr. Salvato continued to prescribe anabolic steroids to Mr. Angelo in violation of the standard of care associated with a clinical study and the prescription of a drug. The trial court acted within its discretion in concluding that these opinions suffice to identify specific conduct and to provide a basis for concluding the claims have merit.

As to causation, Dr. Campbell opines that the warning signs of cardiac disease should have led Dr. Salvato to (1) exclude Mr. Angelo from the study; (2) cease prescribing anabolic steroids to Mr. Angelo once adverse health indicators were noted; and (3) conduct further cardiovascular evaluation to properly diagnose left ventricular hypertrophy, an abnormality related to the abuse of anabolic steroids. Dr. Campbell opines that these failures, and the continued prescription of anabolic steroids, caused the left ventricular hypertrophy and related chronic hypertension that proximately caused Mr. Angelo's death - which the autopsy attributed to cardiac disease. According to Dr. Campbell's report, Dr. Salvato failed to accurately monitor Mr. Angelo's health and withdraw him from the study given the harm that the anabolic steroids were causing.

The trial court found that Dr. Campbell's report was sufficient to apprise Dr. Salvato of the specific conduct

Angelo alleges was a departure from the standard of care, and the basis for establishing a causal link between the departures and Mr. Angelo's death. *Gray*, 189 S.W.3d at 859. The trial court's decision was within the scope of its discretion. *Larson*, 197 S.W.3d at 304-05; *see also Mem'l Herman Healthcare Sys.*, 230 S.W.3d at 757.

We overrule Dr. Salvato's second issue.

**IV. Conclusion**

The trial court found that Dr. Campbell's report, coupled with her curriculum vitae, provided a sufficient basis to conclude she is qualified to offer expert testimony in this case. The trial court concluded that the requisite specificity regarding standard of care and causation are present in Dr. Campbell's report. The trial court acted within its discretion in so doing.

The trial court's order is affirmed.

Judgment rendered and Memorandum Opinion filed April 8, 2008.

---------

Notes:

[1] The QRS complex is a structure on the electrocardiogram (ECG) that corresponds to the Q, R, and S waves representing the depolarization of the ventricles. A proper ECG reading can measure the rate and regularity of heartbeats, as well as determine the size and position of the chambers. This enables a practitioner to assess the presence of any damage to the heart and the effects of drugs or devices to regulate the heart. Elevated QRS readings have been linked to left ventricular hypertrophy - a condition that may occur naturally but also has been linked to certain conditions. Left ventricular hypertrophy is a thickening of the muscle on the left ventricle of the heart, and has been linked to aortic stenosis (a malfunction of the valve between the left ventricle and the aorta which impedes blood flow); aortic insufficiency (a malfunction of the valve between the left ventricle and the aorta which allows blood to flow in the wrong direction); and hypertension (chronic high blood pressure).

[2] Atherosclerotic cardiovascular disease is a disease that affects the arterial blood vessels, often referred to as "hardening" or "furring" of the arteries.

[3] All clinical studies are required to have Institutional Review Board (IRB) approval before commencing. Universities and medical establishments that conduct clinical trials appoint knowledgeable individuals to sit on these boards and to screen all trials to insure that they are ethical, protective of the health of the individuals, and conducted in accordance with solid methodological standards.

[4] Cardiomegaly is a medical condition wherein the heart is enlarged.

[5] Defendants' motion to dismiss, filed June 7, 2007, sought dismissal pursuant to Texas Civil Practice and Remedies Code section 74.351(b); the motion did not assert that Angelo failed to file a report, but rather that Angelo failed to file a "competent expert report by a qualified expert."

[6] Section 51.014(a)(10) also allows an interlocutory appeal from the granting of a motion to dismiss under section 74.351(l), which provides that a court "shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represents an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." *See* Tex. Civ. Prac. & Rem. Code ' 74.351(l) (Vernon Supp. 2007).

[7] The following decisions adopt *Group*'s reasoning or employ similar reasoning: *CHCA Mainland, L.P. v. Burkhalter*, 228 S.W.3d 221, 224-25 (Tex. App.-Houston [1st Dist.] 2007, no pet.); *HealthSouth Corp. v. Searcy*, 227 S.W.3d 907, 908 (Tex. App.-Dallas 2007, no pet.)*; Sides v. Guevara*, S.W.3d, 2007 WL 2456882, at *2 (Tex. App.-El Paso Aug. 30, 2007, no pet.). Other decisions conclude there is no appellate jurisdiction under these circumstances. *See, e.g., Jain v. Stafford*, 214 S.W.3d 94, 97 (Tex. App.-Fort Worth 2006, no pet.); *Lewis v. Funderburk*, 191 S.W.3d 756, 759 (Tex. App.-Waco, 2006, pet. granted). The Texas Supreme Court has not decided this issue, which is pending before the court in *Funderburk*.

---------